UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHARON DELOIS JACKSON, | |
| Plaintiff, | Case No. 3:13-00692 |
| v. | Chief Judge Crenshaw |
| | Magistrate Judge Newbern |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | |
| Defendant. | |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief Judge

## REPORT AND RECOMMENDATION

Pending before the Court in this Social Security action is Plaintiff Sharon Delois Jackson's Motion for Judgment on the Administrative Record (Doc. No. 31-1), to which the Commissioner of Social Security has responded (Doc. No. 33). Jackson has filed a reply in support of her motion. (Doc. No. 36-1.) Upon consideration of these filings and the transcript of the administrative record (Doc. No. 10),[2] and for the reasons given below, the undersigned RECOMMENDS that Jackson's motion for judgment be DENIED and that the decision of the Commissioner be AFFIRMED.

---

[1]     Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017, replacing Carolyn W. Colvin in that role. Berryhill is therefore appropriately substituted for Colvin as the defendant in this action, pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g).

[2]     Referenced hereinafter by page number(s) following the abbreviation "Tr."

## I.       Statement of the Case

Jackson filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on July 6, 2009, alleging disability onset as of May 11, 2009 due to heart attack, high cholesterol, high blood pressure, anxiety attacks, depression, and pain in her arms and legs. (Tr. 77.) Tennessee Disability Determination Services denied Jackson's claims upon initial review and again following her request for reconsideration. Jackson requested de novo review of her case by an Administrative Law Judge (ALJ). The ALJ heard the case on December 14, 2011, when Jackson appeared with counsel and gave testimony. (Tr. 582–98.) A vocational expert also testified at the hearing. At the conclusion of the hearing, the ALJ took the matter under advisement until February 8, 2012, when she issued a written decision finding Jackson not disabled. (Tr. 13–23.) That decision contains the following enumerated findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.

2.      The claimant has not engaged in substantial gainful activity since May 11, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: coronary artery disease, congestive heart failure, history of myocardial infarction, hypertension, aortic insufficiency, chronic obstructive pulmonary disease (COPD), and depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). However, the claimant should engage in no more than occasional stooping, crouching, crawling, bending, kneeling, and balancing. She should avoid concentrated

exposure to temperature extremes, poor ventilation and pulmonary irritants. Mentally, the claimant is capable of performing simple, routine tasks with only occasional exposure to the public and an articulated production schedule so that she will have no need for the use of goal-setting judgments.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on November 28, 1958 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 11, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15–17, 21–22.)

On November 29, 2012, the Appeals Council denied Jackson's request for review of the ALJ's decision (Tr. 6–8), rendering that decision final. This civil action seeking review was timely filed on July 12, 2013. 42 U.S.C. § 405(g).

## II.    Review of the Record

The record of medical treatment begins on May 11, 2009, when, without any past medical history of coronary artery disease, Jackson suffered a heart attack. (Tr. 169.) She was hospitalized with an "acute inferior wall myocardial infarction," and angiography showed total

occlusion of her right coronary artery. (Tr. 165, 176–77.) On May 12, an angioplasty procedure was performed with the placement of two stents. (*Id.*) Jackson thereafter developed swelling and pain in her groin at the site where the cardiac catheter was introduced, and a "[l]arge right groin pseudoaneurysm" was discovered. (Tr. 178.) After this condition was successfully treated, Jackson was discharged from the hospital on May 16, 2009, with a prescription for "[a]ppropriate medications" for a heart attack patient and instructions to follow up with a cardiologist in 4-6 weeks, follow a cardiac diet, and return to work in two weeks. (Tr. 165–66.)

On May 26, 2009, Jackson presented to the emergency room complaining of intermittent chest pain over the prior two days and headaches that had occurred in the two weeks since her heart attack. Her blood pressure was elevated; otherwise, physical examination produced normal results. (Tr. 191–92.) Laboratory test results were largely unremarkable, and Jackson was assessed with chest pain, hypertension, headache, and a history of coronary artery disease, high cholesterol, hypertension, and tobacco abuse. (Tr. 192.) She was admitted to the hospital for an overnight stay in order to gain control of her blood pressure. (*Id.*)

Late in the evening on June 13, 2009, Jackson presented to the emergency room complaining of sharp pain to her left arm with numbness and with shortness of breath for the prior two-and-a-half hours. (Tr. 227.) Her symptoms had not been relieved by a sublingual nitroglycerin tablet. Two additional nitroglycerin tablets were given to Jackson in the emergency room, with no apparent benefit. An hour later, Jackson was given 20 milligrams of Lasix intravenously. Three hours after the Lasix was administered, Jackson reported improvement in her symptoms. She was discharged from the emergency department early on the morning of June 14, 2009, with diagnoses of mild congestive heart failure (CHF) and pleuritic (non-cardiac) chest

pain.[3] (*Id.*) She was prescribed Lasix (Tr. 492) and was instructed to continue all current medications and see her cardiologist the next day. (Tr. 231.)

On June 15, 2009, Jackson followed up with her cardiologist's office, where she reported recent lower extremity swelling. (Tr. 238.) It was noted that she "becomes tearful for no apparent reason" and that she would follow up with another provider for evaluation of possible anxiety. (Tr. 239.) An echocardiogram performed that day revealed moderate aortic insufficiency. (Tr. 240.)

On July 13, 2009, Jackson visited the hospital clinic where she reported feeling nervous, upset and crying daily, with anxiety attacks occurring almost daily. She reported loss of interest in her regular activities and not wanting to go outside the house. (Tr. 294.) She wanted to be tested for HIV and was assessed as having engaged in high-risk sexual behavior. (Tr. 294–95.) She was also assessed with hypertension, hyperlipidemia, depression, insomnia, anxiety, and allergic rhinitis; she was prescribed Xanax for anxiety, Lexapro for depression, and Zolpidem for insomnia. (Tr. 295.) She indicated that she smoked two packs of cigarettes per day. (Tr. 294.)

On July 21, 2009, Jackson's blood pressure was again elevated at a clinic visit, and her medication was changed. (Tr. 237.) Later that evening, Jackson returned to the emergency room, where she was diagnosed with atypical chest pain and hypertension. (Tr. 265.) Her lab work and the report of chest pain indicated the need to rule out another myocardial infarction, and she was transferred to a regional hospital for that evaluation. (*Id.*) On July 22, 2009, Jackson was admitted to the Regional Hospital of Jackson, Tennessee, with a diagnosis of chest pain. (Tr. 259.) Her chest pain had been relieved with nitroglycerin, and she reported smoking one pack of

---

[3]     Pleuritic chest pain occurs when the pleura, "a membrane consisting of a layer of tissue that surrounds the lungs," becomes inflamed. The result of this inflammation is sharp pain that worsens during breathing. Mayo Clinic, *Pleurisy*, http://www.mayoclinic.org/diseases-conditions/pleurisy/home/ovc-20264974 (last visited August 13, 2017).

cigarettes per day. (*Id.*) Cardiac enzyme testing, EKG, and chest x-rays returned normal results, and a cardiology consult was ordered. (Tr. 260.) She also underwent a transthoracic echocardiogram that day, which revealed normal left ventricle size and systolic function; normal right ventricle size and function; normal mitral valve structure and function; normal aortic valve structure and function; and normal aortic root size. (Tr. 242–43.) On the following day, July 23, 2009, Jackson was seen by the cardiologist, to whom she reported that her chest pain had been similar to the pain she felt in May when she had her heart attack. (Tr. 261.) She reported smoking one-half pack of cigarettes per day for 37 years. (*Id.*) The cardiologist recommended left heart catheterization due to Jackson's significant history of coronary artery disease. (Tr. 262.) This procedure showed that the left main coronary artery was normal but that other arteries were irregular, though none were occluded. Jackson was found to have non-occlusive coronary artery disease and was discharged on July 24, 2009 with diagnoses of chest pain and anxiety, and with a prescription for the sedative Ativan to be used as needed. (Tr. 257–58.)

In August and September of 2009, Jackson was treated by nurse practitioner Nicole D. Wilson for an acute upper respiratory infection that developed into acute bronchitis. She reported mild pleuritic pain that had persisted for one week, but no cardiovascular symptoms. (Tr. 287, 291.) In addition to the infection, she was diagnosed with insomnia and adjustment disorder with mixed anxiety and depression. (Tr. 292.) Bilateral diffuse wheezing was appreciated on examination of Jackson's chest. (Tr. 288.) Ms. Wilson noted that Jackson reported an upcoming trip to stay with her son in Atlanta for three months so that he could help her. She also noted her discussion with Jackson about smoking cessation, but that Jackson "is not ready to quit at this time." (*Id.*)

In October 2009, Jackson experienced increased shortness of breath and orthopnea[4] over a span of weeks, until these symptoms became severe enough that she went to the emergency room, where she also reported a feeling of chest tightness. (Tr. 341.) She was initially worked up for possible pneumonia in the emergency room, but upon admission to the hospital her attending physician, Dr. Scott W. Kirsch, "found that rather than her having an infection, she was suffering from a congestive heart failure exacerbation. Her BNP[5] was 1924. She also had distant breath sounds and bilateral wheezes on auscultation." (*Id.*) Jackson's symptoms resolved with an increased dose of Lasix. (*Id.*) She also reported that she had been having some increasing difficulty with depression and anxiety, and Dr. Kirsch recommended she follow up with mental health counseling. (Tr. 342–43.) She was discharged under "strong precautions to come back to the emergency room should she have any return of chest pain, orthopnea, shortness of breath, dyspnea on exertion, or any other worrisome signs and symptoms." (Tr. 343.)

On October 19, 2009, Jackson was evaluated at government expense by Licensed Senior Psychological Examiner Melissa H. Greer, M.S. (Tr. 297–302.) Ms. Greer took the following history from Jackson:

> Ms. Jackson stated that she has "always had depression, but gotten worse since heart attack" (May of 2009). Symptoms of depression include crying spells, trouble sleeping, and keeping to herself more. She experiences these symptoms daily. Additionally, she stated that three to four times a week for the last two years she

---

[4]     "Orthopnea is the sensation of breathlessness in the recumbent position, relieved by sitting or standing." Vaskar Mukerji, *Dyspnea, Orthopnea, and Paroxysmal Nocturnal Dyspnea*, Clinical Methods: The History, Physical, and Laboratory Examinations (3d ed. 1990), https://www.ncbi.nlm.nih.gov/books/NBK213/ (last visited August 13, 2017).

[5]     "B-type natiuretic peptide (BNP) is a hormone produced by your heart. It is released in response to changes in pressure inside the heart. These changes can be related to heart failure. In general, the level of BNP goes up when heart failure develops or gets worse, and it goes down when the condition is stable. In most cases, BNP levels are higher in patients with heart failure than people who have normal heart function." Cleveland Clinic, *B-Type Natriuretic Peptide (BNP) Blood Test*, http://my.clevelandclinic.org/health/articles/b-type-natriuretic-peptide-bnp-bloodtest (last visited August 13, 2017).

experiences shortness of breath, rapid heartbeat, "scared I'm having another heart attack, dizzy headed, and breaking out in sweat." She stated that someone always "carries me to the store because I get panicky." She reports difficulty falling asleep and staying asleep nightly for "as long as I can remember." She has fluctuations in her appetite, along with her weight. She reports unprovoked crying spells daily since May of 2009. She has had no homicidal ideation or recent suicidal thoughts. . . .

(Tr. 298.) After testing Jackson's mental status, Ms. Greer noted that she "presented with appropriate affect and good range of affect"; that her mood was "mildly dysphoric, becoming tearful at times"; that behavioral observations suggested mild anxiety; and that gross psychomotor functioning was unimpaired. (Tr. 300–01.) Ms. Greer opined that Jackson had "Mild to Moderate [limitations] due to depression and anxiety" in all domains of work-related mental functioning. (Tr. 301.) She diagnosed Jackson with "Major Depressive Disorder, Recurrent, Mild" and "Panic Disorder with Agoraphobia," and assigned a GAF score of 65, consistent with mild symptoms or functional limitations. (Tr. 302.)

On November 3, 2009, Jackson was seen in follow up by nurse practitioner Wilson. (Tr. 304–07.) She had high blood pressure but no other cardiovascular symptoms, and reported anxiety, hopelessness, and mood swings. (Tr. 306.) She was scheduled to see her cardiologist the next day, November 4, 2009. She reported that she had received nicotine gum from the health department, and that she was "going to try to quit smoking for her health." (Tr. 307.) Her anxiety medication dosage was increased, and she was referred to mental health counseling. (Tr. 306.)

On the evening of November 4, after visiting her cardiologist's office earlier in the day and having her blood pressure medication changed from Lisinopril to Diovan (Tr. 312), Jackson went to the emergency room complaining of an increased heart rate that she thought might be an anxiety attack. She had reported to her cardiologist that she had "just starting thinking about stuff." (Tr. 333.) She reported to the emergency room nurse that she had been non-compliant

with her anxiety medication that day. (*Id.*) Her blood pressure was elevated in the emergency room. She was treated with an intravenous dose of the sedative Ativan, which resolved her symptoms. Her discharge diagnoses were palpitations, panic attack, and pruritis. (*Id.*) She was discharged with a prescription for Vistaril, to be taken as needed for itching associated with pruritis, and was to start the antihypertensive Diovan the next day, for blood pressure control. (Tr. 336.) The cause of Jackson's itching was diagnosed twelve days later as "Delayed Hypersensitivity Reaction to H1N1 Vaccination." (Tr. 481.) It appears that she was further suspected of having an adverse reaction to Diovan, resulting in its discontinuation on January 4, 2010. (Tr. 460, 466.)

On December 10, 2009, Dr. Jayne F. Dubois, Ph.D., opined based on her review of Jackson's file—in particular the October 2009 report of consultative psychological examiner Greer and the evidence that Jackson had continued since that report to have symptoms of anxiety, depression, mood swings, feelings of hopelessness, and anxiety attacks—that Jackson could not "complete a normal workday/workweek without interruptions from psychologically based [symptoms] or perform at a consistent pace [without] an unreasonable number and length of rest periods." (Tr. 368–72.) Dr. Cal VanderPlate, Ph.D., ABPP, disagreed with this assessment (Tr. 403–09), noting that Jackson presented to Ms. Greer with "only mild anxiety and depression," that she had no current formal psychiatric treatment, and that her treating doctors did not indicate clinically significant psychiatric symptoms but merely diagnosed anxiety state and adjustment disorder. (Tr. 408.) Dr. Dubois subsequently reconsidered her original assessment (Tr. 504–21), and opined that Jackson was "currently experiencing mild to moderate limitations from [mental health] standpoint." (Tr. 520.)

On December 13, 2009, Jackson was admitted to the hospital after presenting to the emergency room with increased shortness of breath and chest tightness. She had a BNP initially that was elevated to 1548. However, Dr. Kirsch noted as follows in her discharge summary:

> It should be noted that the patient does have chronic congestive failure and her BNP is chronically elevated into the range of approximately 1500 to 2000. It probably is appropriate for this patient to assess her possibility of a congestive failure exacerbation with clinical symptoms and a chest x-ray. [O]n this admission she had a chest x-ray which showed no vascular congestion and essentially was read as normal. On her last admission she had an echocardiogram which revealed an ejection fraction of 61% which is normal. The patient was discharged to home with instructions to return to the emergency room should she have any worsening of her symptoms. . . .

(Tr. 417–18.) Jackson's discharge diagnoses were congestive heart failure exacerbation, coronary artery disease, hypertension, hypercholesterolemia, and aortic insufficiency. (Tr. 418.)

In late 2009 or early 2010, Jackson began treatment at Quinco Community Mental Health Centers (Quinco) with Renee Crosswhite, APN. (Tr. 559–60.) A treatment plan was formed to address her diagnoses of "major depressive disorder, recurrent episode severe without mention of psychotic behavior," and "anxiety state unspecified." (Tr. 560.) An initial evaluation for purposes of providing medical services was performed on February 17, 2010, where it was reported that Jackson was currently being prescribed Xanax, but that she did not take it often. (Tr. 564.) She reported being sent to Quinco because counseling was needed after her heart attack. (*Id.*) She further reported that "because I am a recovering addict I have to watch what I take." (*Id.*) She stated that she has anxiety attacks and was running back to the hospital due to anxiety. (*Id.*) Nurse Crosswhite noted that Jackson tends to isolate, and that she was tearful at times during the evaluation. (*Id.*) Nurse Crosswhite diagnosed major depressive disorder, recurrent, and anxiety disorder, not otherwise specified. (Tr. 567.) She prescribed Cymbalta. (*Id.*)

On January 8, 2010, Dr. Frank R. Pennington, M.D., opined based on his review of Jackson's file that she could perform light work that did not require more than occasional postural activities, and that did not require concentrated exposure to pulmonary irritants or to extreme cold or heat. (Tr. 374–82.) A second medical consultant, Dr. Darrell R. Caudill, M.D., agreed with Dr. Pennington's assessment. (Tr. 383–84.)

On February 25, 2010, Jackson was again admitted to the hospital with complaints of chest pain, shortness of breath, and dyspnea on exertion. (Tr. 431–33.) Dr. Hirsch again attended to Jackson and noted that her BNP was elevated, while her blood gas readings revealed what appeared to be a compensated respiratory acidosis.[6] Dr. Hirsch noted that due to Jackson's history of smoking, these test results may imply that she has COPD. (Tr. 432.) He opined that "[o]verall this appeared to be a mild heart failure exacerbation, but there are possibilities that other medical conditions are contributing to these repetitive episodes of shortness of breath and dyspnea on exertion." (*Id.*) After recounting Jackson's prior, largely normal echocardiogram and cardiac catheterization results, Dr. Kirsch noted that the pulmonary function tests which he ordered during her hospital stay indicated that she was "certainly at risk for COPD." (Tr. 431–32.) He "made the strong recommendations the patient stop smoking," gave her an albuterol nebulizer to treat her shortness of breath, and also recommended that she schedule an outpatient

---

[6]  "Respiratory acidosis, also called respiratory failure or ventilatory failure, is a condition that occurs when the lungs can't remove enough of the carbon dioxide ($CO_2$) produced by the body. . . . Respiratory acidosis is typically caused by an underlying disease or condition . . . such as asthma, COPD, pneumonia, or sleep apnea." Healthline, *Respiratory Acidosis*, http://www.healthline.com/health/respiratory-acidosis#Overview1 (last visited August 13, 2017). Compensated respiratory acidosis typically occurs where the increased concentration of carbon dioxide in the blood is the result of a chronic condition and thus has a slow onset, allowing the kidneys time to compensate for the change in blood chemistry. *Id.*

sleep study to determine whether she has obstructive sleep apnea, which was indicated by her body habitus and "would have an effect on her risk of heart failure." (Tr. 432.)

Jackson continued to pursue mental health treatment with Nurse Crosswhite at Quinco throughout 2010 and 2011 (Tr. 523–30, 539–69), and continued to be diagnosed with major depressive disorder and anxiety disorder, treated with medications, and assessed with a Global Assessment of Functioning (GAF) score of 50.[7] Adjustments to her medications were made as necessary to address her report of symptoms. Jackson reported having difficulty sleeping at night and experiencing family and financial stressors, but indicated that she was satisfied with her medications despite needing to adjust the dosages occasionally to alleviate side effects. In December 2010, she was noted to be stable but still having some ongoing difficulties. (Tr. 554.) In November 2011, she reported being stressed and feeling trapped because she wanted to move but could not because of financial struggles. (Tr. 539.)

On December 12, 2011, Jackson visited the Heart Failure Clinic within Vanderbilt University Hospital's Heart and Vascular Institute, and was examined by Dr. Daniel J. Lenihan. (Tr. 571–75.) Jackson reported the following history to Dr. Lenihan: "She is doing OK. She does not sleep well but denies any PND[8] or orthopnea. She did just quit smoking. She denies any chest pain but gets short of breath with any activity. She does not walk at all for most anything. Her weight has been stable." (Tr. 571.) Dr. Lenihan noted that Jackson had mild diastolic heart

---

[7]     A GAF score between 41 and 50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) (emphasis in original).

[8]     "Paroxysmal nocturnal dyspnea (PND) is a sensation of shortness of breath that awakens the patient, often after 1 or 2 hours of sleep, and is usually relieved in the upright position." Vaskar Mukerji, *Dyspnea, Orthopnea, and Paroxysmal Nocturnal Dyspnea*, Clinical Methods: The History, Physical, and Laboratory Examinations (3d ed. 1990), https://www.ncbi.nlm.nih.gov/books/NBK213/.

failure, that she was initially in "New York Heart Association functional class III" but is currently in functional class II, and that she was "ACC/AHA: stage B." (*Id.*)[9] He further recorded that Jackson's past medical history includes moderate COPD and chronic depression, but no orthostatic hypotension (low blood pressure when standing). (*Id.*) Dr. Lenihan noted that Jackson had an eleventh grade education and that she was unemployed. (Tr. 572.) He further noted that she does not exercise and that, with regard to cigarette use, she had stopped smoking on November 1, 2011, and had been a pack per day smoker who had "accumulated 41-50 pack years." (*Id.*) Dr. Lenihan took note of Jackson's laboratory work, her pulmonary function test results, and the mild findings reported from a January 2010 echocardiogram. (Tr. 574.) He concluded by stating that "[s]he is actually doing fairly well" and counseling her to increase her level of physical activity by walking every day, while continuing to refrain from smoking cigarettes. (Tr. 575.) Dr. Lenihan instructed Jackson to return to the clinic in six months. (*Id.*)

Jackson summarizes her testimony at the December 14, 2011 hearing before the ALJ as follows:

> Ms. Jackson explained to the ALJ that she had lost her last job because the company she was working for "closed," she had continued to look for work but couldn't find any ("there wasn't nothing there at the time that was in Savannah") and 6 or 8 months after losing her job she suffered the hear[t] attack on 05/11/09. (Tr. 583–585) Asked by the ALJ "And what kind of things do you do around the house?" Ms. Jackson said "Mostly there, I'm just there." (Tr. 585) The ALJ told Ms. Jackson "you filled out a form for me that said you did? It said you cooked, you cleaned, you drove?" (*Id.*) She responded "I started out doing all of that. Now, I just don't

---

9       New York Heart Association functional class II includes "[p]atients with cardiac disease resulting in slight limitation of physical activity. They are comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain." (Doc. No. 31-2, PageID# 796; Doc. No. 33, PageID# 841 (quoting https://my.americanheart.org/professional/StatementsGuidelines/ByPublicationDate/PreviousYears/ Classification-of-Functional-Capacity-and-Objective-Assessment_UCM_423811_Article.jsp)). ACC/AHA Stage B includes "[p]eople who have developed structural heart disease that is strongly associated with the development of heart failure (such as those with a history of heart attack, those with a low ejection fraction, valve disease with no symptoms) but without signs and symptoms of heart failure." WebMD, *Heart Failure Treatment by Stage*, http://www.webmd.com/heart-disease/heart-failure/heart-failure-treatment-by-stage (last visited August 13, 2017).

do nothing. My breathing got bad, my breathing just got worse. They put me on a breathing machine. At first I was not even on a breathing machine." (Tr. 585–586)

In response to questions from the ALJ, Ms. Jackson testified "The heart attack just totally scared me . . . It took everything from me. I'm too scared to do anything . . . It took me. It took who I was. It took it away from me, because I'm always, I'm still scared, I'm always scared. I don't sleep . . . I'm scared to go to sleep. I stay depressed." (Tr. 587–588)

In response to questions from her representative, Ms. Jackson testified that her problems included "headaches, the tiredness, the no sleeping, my leg going out on me at times – . . . I also have panic attacks. I'm on medication." (Tr. 590) The panic attacks were occurring 2 to 3 times a week. (*Id.*) She described her panic attacks as follows:

> I get scared, I get nervous, I feel closed in, my heart starts beating real fast, and when that starts happening, it makes me scared I'm going to have a heart attack again, so – . . . it just seems like it just all of the sudden just happens. You know. I'm on the medication, I take it three times a day, they tried upping it, and it just seems like it makes me, you know, and I don't want to go through none of that . . . So, she put it back down to 10. But the panic attacks, I've never dealt with, I've never had no problem, never had them, but it's taking a big toll.

(Tr. 591)

Ms. Jackson testified that she could stand "probably like 15, 20 minutes" and then "I get tired. My breathing gets shorter." (Tr. 591–592) She said she could "probably" walk a city block "but I will be out of breath." (Tr. 592)

Ms. Jackson testified that she had quit smoking cigarettes almost 4.5 months prior to the hearing. (Tr. 593).

(Doc. No. 31-2, PageID# 809–10.)

## III.  Analysis

### A.  Legal Standard

Judicial review of "any final decision of the Commissioner of Social Security made after a hearing" is authorized by the Social Security Act, which empowers the district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court reviews the final decision of the Commissioner to determine whether substantial evidence supports the agency's findings and whether the correct legal standards were applied. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). The Court also reviews the decision for procedural fairness. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Id*. at 723. Failure to follow agency rules and regulations, therefore, "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id*. (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).

The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record . . . [but] 'must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

## B.     The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The agency considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.   Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 n.6 (6th Cir. 2016); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, the burden shifts to the Commissioner to "identify a significant number of

jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile" *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the ALJ must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)). The agency can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids function only as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the agency must rebut the claimant's prima facie case with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

### C. Plaintiff's Statement of Errors

Jackson argues that the ALJ erred in the following ways: (1) by relying upon the testimony of a vocational expert whose credentials are unknown and who testified in response to an incomplete hypothetical; (2) by failing to consider whether Jackson's conditions were the medical equivalent of the conditions described in Listings 4.02 (chronic heart failure) and 12.06(A)(3) (recurrent severe panic attacks); (3) by making an adverse credibility finding that is

not grounded in the evidence; (4) by failing to appropriately consider the severity of Jackson's obesity and insomnia; (5) by failing to consider all evidence of record; (6) by failing to appropriately consider the severity of Jackson's subjective symptoms; (7) by relying on Jackson's failure to follow medical advice to stop smoking as a basis for denying benefits; and (8) by violating the treating physician rule as it pertains to Advanced Practice Nurse Renee Crosswhite. For the reasons that follow, the undersigned finds that none of these alleged errors warrants reversal of the ALJ's disability determination.

### 1.     Vocational expert testimony

Jackson challenges the reliability of the vocational testimony taken at her hearing, arguing that it cannot be determined whether the purported expert, Nancy Hughes, was qualified to offer an expert opinion because her credentials are not contained in the record. However, Jackson was on notice of this issue at the time of the hearing and her representative did not raise this issue before the ALJ or question Ms. Hughes as to her qualifications or the substantive vocational issues in the case. (Tr. 596.) A similar scenario was faced by the court in *Carter v. Colvin*, No. 2:14-cv-244, 2014 WL 6809177 (S.D. Ohio Dec. 2, 2014). There, the court recognized that the Hearings, Appeals and Litigation Law Manual of the Social Security Administration—while not binding authority, *Bowie v. Comm'r of Soc. Sec.*, 539 F. 3d 395, 399 (6th Cir. 2008)—does state that the record should contain a statement of the vocational expert's qualifications. *Id.* at *2. The court further found that the plaintiff had essentially waived the issue by failing to raise it before the ALJ during the hearing, "when it could have been promptly and easily remedied." *Id.* Finding that "[i]t would have been the better practice for the Administrative Law Judge to build a more complete record, and it would have been the better practice for counsel to raise that issue at the logical time and not well after that time had passed," the court

found no reversible error. *Id.* at *2–3. The same reasoning applies here. Jackson did not contest the vocational expert's qualifications at her hearing. The ALJ's failure to include the expert's qualifications in the record is not reversible error now.

Jackson further contends that Ms. Hughes's testimony is unreliable because it was given in response to a hypothetical question that failed to account for Jackson's need "to miss work repeatedly (at least during the first year of disability) for days at a time due to her conditions becoming so severe that she either had to be treated in an ER or was admitted to the hospital through an ER." (Doc. No. 31-2, PageID# 818.) However, the record does not support a finding that Jackson would face that kind of absenteeism beyond early 2010. Jackson's seventh and final hospitalization occurred in February 2010, roughly nine months after her alleged disability onset date of May 11, 2009. (Tr. 431–33.) Her last emergency room visit was in April 2010. (Tr. 467–72.) Thus, there had been no emergency room visits and no hospitalizations for almost two years before the date of the ALJ's decision. Moreover, Jackson's own reports confirm that the repeated emergency room visits following her May 2009 heart attack were largely provoked by her understandable anxiety over suffering another heart attack when she experienced shortness of breath or other symptoms. (Tr. 108–09, 298, 564.) Indeed, Dr. Kirsch gave Jackson "strong precautions to come back to the emergency room should she have any return of chest pain, orthopnea, shortness of breath, dyspnea on exertion, or any other worrisome signs and symptoms." (Tr. 452.) Because Jackson's emergency room visits ceased entirely less than a year after they began, the ALJ had no reason to include absenteeism related to medical treatment as an enduring limitation on Jackson's ability to work in the hypothetical she gave the vocational expert. *See Morgan v. Comm'r of Soc. Sec.*, No. 1:09CV1001, 2010 WL 2760122, at *8–9 (N.D. Ohio July 13, 2010) (finding that plaintiff's treatment at hospital over 7 months as participant in

"partial hospitalization program" did not establish her unavailability for work, citing lack of "evidence that Plaintiff was expected to continue with partial hospitalization for a 12 month period").

### 2. Evaluation of the Listings

Jackson next argues that the ALJ erred in failing to determine whether her medical history met the listings for chronic heart failure and anxiety related disorders. Jackson points out that the ALJ is responsible for deciding medical equivalence under 20 C.F.R. § 404.1526(e) and argues that the ALJ erroneously failed to determine the matter as it relates to Listings 4.02 (cardiovascular) and 12.06(A)(3) (mental disorders). However, Social Security Ruling (SSR) 96-6p instructs that an ALJ may rely upon the Disability Determination and Transmittal from the state agency and the medical opinion that informs it (Tr. 24–25) to establish that no listing is equaled unless, "in the opinion of the [ALJ,] . . . the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable," or additional evidence is received that the ALJ feels may change the state agency consultant's determination of no listing-level impairment. SSR 96-6p, 1996 WL 374180, at *3–4 (July 2, 1996).

The ALJ in this case did not believe that either of these two exceptions applied. With regard to Jackson's cardiovascular impairments, the ALJ first made the following determination as to support in the record for any listing-level impairment:

> The claimant's impairments do not meet or medically equal one of the listed impairments because the medical evidence of record does not support such a finding. Although laboratory testing has confirmed that the claimant has severe impairments of the cardiovascular and respiratory systems, there are no findings that fall within the levels required by the listed impairments.

(Tr. 16.) Second, with respect to the evidence adduced after the state agency determination, the ALJ noted the low frequency of CHF exacerbations and the absence of abnormalities on physical examination and a variety of diagnostic tests (Tr. 18–19), as well as the more recent findings of Dr. Lenihan, a specialist at the Vanderbilt University Hospital Heart Failure Clinic:

> The record shows that the claimant is classified as New York Heart Association class II and ACC/AHA: Stage B (Exhibit 30F). Such classifications indicate that the claimant has slight limitation of physical activity, is comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea. Stage B heart failure indicates that the claimant has heart damage but no symptoms of heart failure. Her most recent treatment records are from the Heart Failure clinic and indicate that she has been doing "OK" despite being admitted to the ER for atypical chest pain. At that time, a cardiac evaluation was negative and she was discharged home (Exhibit 30F). Physical examination of the claimant revealed chest pain, but no extremity edema, palpitations, or syncope, no irregular heart rhythm, apical impulse displacement or S3. Her apical impulse size was normal, and there was normal jugular pressure and S1 quality and S2 quality. Treatment notes confirmed the absence of heart murmur or hepatojugular reflux. A January 2010 echocardiogram showed borderline hypokinetic in the apica[l] 2[]-chamber view, with the other LV walls moving well. There was mild LVH with normal left atrial size and normal left ventricle ejection fraction. The treating physician indicated that he would encourage the claimant to walk everyday and to quit smoking (Exhibit 30F). These clinical findings are inconsistent with chronically disabling congestive heart failure or any cardiovascular pathology that would cause disabling symptoms.

(Tr. 19.) In view of this discussion, as well as the fact that Jackson does not identify any medical findings that she would assert as the medical equivalent of listing criteria, the undersigned must conclude that substantial evidence supports the ALJ's finding that further evaluation of Jackson's cardiovascular impairments vis-à-vis the listings was not warranted.

Regarding Listing 12.06 (Anxiety-Related Disorders), both state agency consultants explicitly determined that the listing criteria were not met or equaled (Tr. 356, 366–67, 370–72, 385, 395–96, 399–400), and the ALJ addressed the listing as well. (Tr. 16.) Jackson contends that further analysis of equivalence is warranted, comparing her "panic attacks in combination with her other impairments" (Doc. No. 31-2, PageID# 819) with the listing criterion of

"[r]ecurrent severe panic attacks." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(A)(3). However, the ALJ cited multiple sources of treatment notes indicating that Jackson did not frequently present with severe anxiety, even when she claimed that she was having a panic attack during a treatment session. (Tr. 19–20, 544–45.) This evidence, which the ALJ found "highly incompatible with mental health impairments that would impose disabling functional restriction," constitutes substantial evidence to support the ALJ's finding that Jackson did not meet or equal the definition of the listing. (Tr. 20.)

### 3.    Credibility

In determining Jackson's credibility, the ALJ noted her testimony that her physical abilities are hampered by chronic fatigue and shortness of breath and that "her legs give out, her medications make her sleepy, and . . . her breathing is getting progressively worse." (Tr. 18.) The ALJ then found as follows:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity [for a range of light work]. Specifically, the claimant's activities, including only ceasing the use of cigarettes four months ago, are inconsistent with a person[] who is wholly unable to perform work activities. Furthermore, the medical evidence does not support a finding of disability.

(*Id.*) Jackson argues that the ALJ erred by discounting her credibility based on evidence that misrepresents the facts while ignoring "the most important facts established in the evidence, such as the fact that Ms. Jackson's symptoms were so severe she repeatedly had to be hospitalized." (Doc. No. 31-2, PageID# 819.) Jackson argues that this runs afoul of Social Security Ruling (SSR) 96-7p, 1996 WL 374186 (July 2, 1996).

As noted above, Jackson's string of hospitalizations ended in February 2010, well before her hearing before the ALJ, and the medical record reflects that her symptoms were frequently more concerning in light of her recent heart attack than they were debilitating in and of

themselves. For example, Jackson was admitted to the hospital on July 22, 2009, with a three-day history of chest pain associated with numbness in her extremities; the pain was "explained as 3/10, no radiation, relieved with nitro[glycerin]." (Tr. 259.) Her cardiac enzymes, EKG, and chest x-ray were all normal, but she was admitted in light of her history "to rule out acute coronary syndrome." (Tr. 257, 260.) After the full complement of cardiac tests was performed, Jackson was diagnosed with "[n]onocclusive coronary artery disease" and discharged with a small supply of the sedative Ativan and instructions to follow up with her primary care physician and cardiologist. (Tr. 258.)

At her last hospitalization, in February 2010, Jackson was admitted with chest pain and chronic shortness of breath and dyspnea on exertion. (Tr. 432.) The attending physician, Dr. Kirsch, concluded that "[o]verall this appeared to be a mild heart failure exacerbation, but there are possibilities that other medical conditions are contributing to these repetitive episodes of shortness of breath and dyspnea on exertion." (*Id.*) When pulmonary function testing showed that Jackson was "certainly at risk for COPD," Dr. Kirsch "made the strong recommendation[] the patient stop smoking . . . [and] gave her an albuterol nebulizer as the nebulizer treatments used in the hospital seemed to have a positive effect on her shortness of breath and sense of well being." (*Id.*) On this record, it cannot be said that the ALJ erred in failing to consider that Jackson's chest pain, shortness of breath, etc. were so severe as to require hospitalization in and of themselves. Instead, it appears that hospitalization was required because her symptoms might have been—but ultimately were not—indicators of another heart attack.

In discussing Jackson's daily activity level, the ALJ primarily drew from Jackson's report to the psychological consultant, licensed senior psychological examiner Melissa H. Greer (Tr. 16, 299), and also referred to Jackson's responses to an agency questionnaire (Tr. 16, 144–51).

While Jackson argues that the record actually establishes her daily activities to be much more limited than indicated in Ms. Greer's report, she largely relies on her own reports of daily activities in questionnaire responses that give greater detail as to the difficulties she experiences that she provided to Ms. Greer. (Doc. No. 31-2, PageID# 798–99.) However, the ALJ was not bound to accept Jackson's written statements in determining her credibility and properly considered her activities as reported to Ms. Greer and elsewhere described by Jackson. The ALJ also properly considered Jackson's failure to quit smoking despite allegedly worsening cardiac and pulmonary problems and the medical evidence of clinically mild cardiovascular impairments and moderate pulmonary disease. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (finding no error in "ALJ's decision to rely on her own reasonable assessment of the record over the claimant's personal testimony").

The ALJ thus arrived at the substantially supported conclusion that Jackson's subjective complaints were only credible insofar as they aligned with the ability to perform light exertional work with no more than occasional postural activities and no concentrated exposure to pulmonary irritants, poor ventilation, or temperature extremes.[10] The ALJ's credibility determination has support in the record and is not "based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (quoting SSR 96-7p, 1996 WL 374186, at *4). It therefore does not run afoul of SSR 96-7p, and is to be accorded the deference typically due such determinations. *E.g.*, *Jones v.*

---

[10] As noted by the ALJ (Tr. 20), it is further pertinent here that the record does not contain any treating physician's opinion or assignment of restrictions that would more significantly limit Jackson than what the ALJ determined in her RFC finding. *See Nunn v. Bowen*, 828 F.2d 1140, 1145 (6th Cir. 1987) ("If Nunn's examining physicians did not advise him of a need to restrict his activities in light of the combination of his hypertension and back problems, we believe that it was not erroneous for the ALJ to determine that Nunn did not have a combination of impairments that would lead to a determination of disability for social security purposes.").

*Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The undersigned finds no reversible error in the ALJ's credibility determination.

### 4.      Evaluation of obesity and insomnia

Jackson argues that the ALJ erred in failing to find that her obesity and insomnia are severe impairments and in failing to consider the impact of those impairments in determining her RFC. She contends that the ALJ's decision does not even mention obesity, in violation of SSR 02-1p, which requires "an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 02-1p, 2002 WL 34686281, at *4 (Sept. 12, 2002). However, Jackson did not assert before the state agency or the ALJ that obesity was a factor in her disability claim (Tr. 31, 35–36, 77, 137), nor has she pointed to any instance where she was diagnosed with obesity or any treatment note or medical opinion that would suggest that she is at all limited by her weight. She has merely pointed to measurements of her height and weight and her own calculations of her body mass index. (Doc. No. 31-2, PageID# 813.) In such circumstances, the ALJ's failure to give attention to the issue of obesity is not erroneous. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).

As to her insomnia, Jackson alleges that it "is very well documented in her treatment records, and she has in fact been diagnosed with and prescribed medication for insomnia since . . . 07/13/09[.]" (Doc. No. 31-2, PageID# 812.) However, while Jackson testified that her heart problems had left her "scared to go to sleep" and that she stayed tired all the time (Tr. 588), she has not identified proof to support any particular work-related limitations resulting from sleep-related fatigue that would not be accommodated by the limitation to a range of light exertional work. The ALJ heard Jackson testify that she would tire too quickly if she tried to perform the cooking, housekeeping, and caretaking work she had done in the past—all medium jobs (Tr.

594))—and that even less-strenuous jobs would require mobility that she does not possess. (Tr. 589–90.) In determining that Jackson retained the ability to perform light work, the ALJ took note of this hearing testimony regarding fatigue, including Jackson's allegation that her medications made her sleepy. (Tr. 18.) In the absence of any treating source opinion or assignment of limitations to the contrary, the undersigned finds that the ALJ gave due consideration to Jackson's insomnia-related complaints. *See Nunn*, 828 F.2d at 1145.

### 5.      Failure to consider all record evidence

With this argument, Jackson summarily asserts that "[t]he ALJ's decision is replete with misstatements of fact, failure to consider pertinent evidence, etc. Her decision is not supported by substantial evidence." (Doc. No. 31-2, PageID# 820.) This argument does not identify misstatements of fact or omitted evidence and therefore is not specific enough to enable the court's review.

### 6.      Evaluation of symptoms

Jackson argues that the ALJ failed to appropriately consider her fatigue and anxiety symptoms, as she did not consider what the record actually established to be Jackson's activities of daily living or consider "'location, duration, frequency, and intensity of symptoms,' which clearly were incompatible with sustained, uninterrupted work activity; the 'type, dosage, effectiveness, and side effects of any medication' (e.g., the months of swelling and itching she experienced, the daytime sleepiness, etc.); her other measures to relieve her symptoms (sleeping during the day, isolating herself from others to decrease her anxiety); etc." (Doc. No. 31-2, PageID# 821) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)). However, as determined above, the ALJ gave sufficient consideration to Jackson's daily activities and her reports of fatigue. Her decision recognized the regulatory requirements for

consideration of subjective symptoms (Tr. 18) and found that (1) the clinical findings and recommendation of daily exercise "are inconsistent with chronically disabling congestive heart failure or any cardiovascular pathology that would cause disabling symptoms;" (2) Jackson had not been hospitalized for COPD-related symptoms, and her failure to stop smoking cigarettes until late 2011 indicated that her pulmonary symptoms were not of disabling severity; (3) although Jackson complained of symptoms of depression and anxiety during her treatment at Quinco, "mental status assessments indicate that she was observed as depressed or anxious on only 2 occasions"; and (4) Jackson was noted by the psychological consultant, Ms. Greer, to exhibit only mild dysphoria and anxiety. (Tr. 19–20.)

The ALJ found that Jackson "does experience psychologically based symptoms; however, there is nothing in the record to show that they occur with sufficient frequency to cause a significant degree of functional limitation." (Tr. 20.) Again, without opinion evidence from any treating mental health source, the ALJ reasonably relied upon the opinions of non-treating sources Greer and VanderPlate to establish mild-to-moderate mental limitations (Tr. 20), resulting in the conclusion that "[m]entally the claimant is capable of performing simple, routine tasks with only occasional exposure to the public, and an articulate[d] production schedule so that she will have no need to set goals." (Tr. 21.) Lastly, with regard to the "months of swelling and itching" Jackson experienced from medication, the ALJ did not err in failing to explicitly account for these transitory symptoms. The undersigned finds that substantial evidence supports the ALJ's consideration of the impact of Jackson's subjective symptoms on her ability to work.

### 7. Jackson's failure to stop smoking cigarettes

Jackson argues that the violated SSR 82-59 in relying upon her failure to follow medical advice to stop smoking as a basis for denying her claims and cites *Shramek v. Apfel*, 226 F.3d

809, 813 (7th Cir. 2000), for the proposition that "the fact that a claimant with chronic obstructive pulmonary disease failed to stop smoking 'is an unreliable basis on which to rest a credibility determination.'" (Doc. No. 31-2, PageID# 822.) However, as the Government points out, the ALJ did not make a finding that Jackson's continued smoking represented a failure to follow prescribed treatment in the face of an otherwise disabling pulmonary impairment, so as to trigger the protocols addressed in SSR 82-59. Nor did she discount Jackson's credibility based only on her failure to stop smoking. Rather, the ALJ addressed Jackson's continued smoking in the context of the credibility of her claim to disabling pulmonary problems. (Tr. 19.) Further, the Sixth Circuit finds whether a claimant has followed advice to quit smoking to be a relevant factor in assessing credibility. *See Sias v. Sec'y of Health & Human Servs.,* 861 F.2d 475, 479–480 (6th Cir. 1988); *see also Blaim v. Comm'r of Soc. Sec.*, 595 F. App'x 496, 498–99 (6th Cir. 2014); *Brown v. Soc. Sec. Admin.,* 221 F.3d 1333, at *1 (6th Cir. 2000) (unpublished table decision); *Barringer v. Comm'r of Soc. Sec.,* No. 13–CV–12746, 2014 WL 4064575, at *13 (E.D. Mich. Aug. 18, 2014); *Sarver v. Comm'r of Soc. Sec.,* No. 07–11597, 2008 WL 3050392, at *6–7 (E.D. Mich. July 28, 2008). In light of this authority, the undersigned likewise finds that Jackson has failed to establish error in the ALJ's consideration of her continued smoking in the face of medical advice that she stop. The ALJ here rightly did not refer to SSR 82-59, but merely found that Jackson's continued smoking undercut the credibility of her claim to disabling breathing problems. Substantial evidence supports this finding.

### 8. Violation of the treating physician rule

Finally, Jackson argues that the ALJ violated the treating physician rule by failing to give good reasons for rejecting Advanced Practice Nurse Renee Crosswhite's opinion that Jackson had serious psychological symptoms or functional limitations, as reflected in her consistent

assignment of the score of 50 on the GAF scale. Jackson asserts that this GAF score is supported by Nurse Crosswhite's treatment notes, which contain her observations that Jackson was at times tearful, stressed, depressed, and anxious, requiring adjustment of her medications to find the right regimen to stabilize her symptoms. However, to judge compliance with the treating physician rule, it must first be determined if the opinion in question was rendered by a treating source. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011). Nurse Crosswhite is not a treating physician, nor even an acceptable medical source,[11] and her GAF assessment is therefore not a "medical opinion" for purposes of the regulations. *See* 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources….").

Moreover, GAF scores have long been held to be of limited utility in the disability determination, as such scores are not a reasonable replacement for the more particularized data available in actual treatment notes or reports of examination results but instead are largely superficial descriptors representing "a clinician's subjective rating of an individual's overall psychological functioning" in terms "understandable by a lay person." *See, e.g.*, *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *see also, e.g.*, *Smith v. Astrue*, 565 F. Supp. 2d 918, 925 (M.D. Tenn. 2008). The GAF score assigned by Nurse Crosswhite does not necessarily describe deficits in work-related mental functioning; by definition, a GAF score between 41 and

---

[11]     "Acceptable medical sources" are (1) licensed physicians (medical or osteopathic doctors); (2) licensed or certified psychologists; (3) licensed optometrists; (4) licensed podiatrists; and (5) qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). Medical sources not on this list, including advanced practice nurses such as Nurse Crosswhite, are "other sources" under the regulations, *id.* § 404.1513(d)(1), whose opinions must be considered but do not qualify for entitlement to controlling weight or the procedural requirement of an explicitly reasoned weighing in the RFC analysis. *See Cole*, 661 F.3d at 938–39; *see also Linkhart v. Comm'r of Soc. Sec.*, No. 1:13-cv-288, 2014 WL 1302621, at *3–5 (S.D. Ohio Mar. 31, 2014) (finding that advanced practice nurse holding "Doctorate of Nursing Practice" did not possess doctorate of medicine or psychology and so cannot be considered a treating source).

50 "reflects the assessor's opinion that the subject has serious symptoms *or* serious impairment of social or occupational functioning." *Kornecky*, 167 F. App'x at 511. Indeed, GAF scores below 50, even where they were assumed to be determinative of work-related mental functioning, have not been found to be per se disabling. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007).

As an "other source" whose opinions are not due the deference prescribed under the treating physician rule, Nurse Crosswhite's GAF assessment must be considered, but no independent statement of good reasons need be provided for rejecting that assessment. Rather, the ALJ's determination of Jackson's mental RFC, made in consideration of her GAF scores and all pertinent evidence of record, must simply be supported by substantial evidence. The ALJ found that the GAF scores assigned by Nurse Crosswhite (and implicitly, the serious symptoms/impairment they represent) were inconsistent with clinical observations recorded in the Quinco treatment records. (Tr. 20.) She further found that the presence of serious psychological symptoms was inconsistent with Jackson's presentation at the psychological consultative examination, described as follows:

> In October 2009, the claimant underwent a consultative examination conducted by Melissa Greer, MS. Ms. Greer noted no more than moderate limitation in any area of functioning (Exhibit 7F). Although Ms. Greer is also not an acceptable medical source, Dr. Carl VanderPlate completed a case analysis using Ms. Greer's clinical observations. He noted that the claimant was characterized as "mildly dysphoric" and exhibiting "mild anxiety." He relied on notes indicating that the claimant's affect was appropriate with good range, and her grooming and hygiene were good. He remarked that the claimant's behavior did not indicate clinically sufficient psychological symptoms and her activities of daily living were fair, with social skills intact. Dr. VanderPlate indicated that these clinical findings did not fully support the claimant's reported restrictions (Exhibit 19F). Such an assessment from a psychologist is highly incompatible with mental health impairments that would impose disabling functional restriction.

(Tr. 20.) Substantial evidence supports this weighing of the mental health evidence and the resulting mental RFC finding. (Tr. 21.)

## IV.      Recommendation

In light of the foregoing, the Magistrate Judge recommends that Jackson's Motion for Judgment on the Administrative Record (Doc. No. 31-1) be DENIED and that the decision of the Commissioner be AFFIRMED.

Any party has fourteen (14) days after being served with this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days after being served with a copy thereof in which to file any responses to said objections. Fed. R. Civ. P. 72(b)(2). Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of the matters disposed of therein. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 14th day of August, 2017.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge